Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Counsel for Plaintiff

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARTIN HERMAN, Individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>THE WESTERN UNION COMPANY, HIKMET ERSEK, SCOTT T. SCHEIRMAN, and RAJESH K. AGRAWAL,<br><br>    Defendants. | **Case No:**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Martin Herman ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings,

- 1 -

wire and press releases published by and regarding The Western Union Company ("Western Union" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired the publicly traded securities of Western Union between February 24, 2012 and January 19, 2017, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

3.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

4.     Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as Defendants conduct business in this district, and a significant portion of the Defendants' actions, and the subsequent damages, took place within this District.

5.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

Class Action Complaint for Violation of the Federal Securities Laws

**PARTIES**

6.     Plaintiff, as set forth in the accompanying Certification, purchased Western Union securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

7.     Defendant Western Union provides money movement and payment services worldwide. The Company operates in three segments: Consumer-to-Consumer, Consumer-to-Business, and Business Solutions. The Company is incorporated in Delaware and its principal executive offices are located at 12500 East Belford Avenue, Englewood, Colorado. The Company also operates numerous agent locations in Los Angeles County. The Company's common stock is traded on the New York Stock Exchange ("NYSE") under the ticker symbol "WU."

8.     Defendant Hikmet Ersek ("Ersek") has been the Chief Executive Officer ("CEO") and President of Western Union since September 1, 2010.

9.     Defendant Scott T. Scheirman ("Scheirman") served as the Chief Financial Officer ("CFO") and Executive Vice President of Western Union from September 2006 until December 31, 2013.

10.     Defendant Rajesh K. Agrawal ("Agrawal") has been the CFO at Western Union since July 15, 2014 and has been its Executive Vice President since November 2011. Defendant Agrawal served as an Interim CFO of Western Union from January 1, 2014 to July 15, 2014.

11.     Defendants Ersek, Scheirman and Agrawal are sometimes referred to herein as the "Individual Defendants."

12.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

- 3 -

Class Action Complaint for Violation of the Federal Securities Laws

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

13.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

14.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

15.     The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements

16.     On February 24, 2012, the Company filed a Form 10-K for the fiscal year ended December 31, 2011 (the "2011 10-K") with the SEC, which provided the Company's year-end financial results and position and stated that the Company's internal control over financial reporting and disclosure controls and procedures were effective as of December 31, 2011. The 2011 10-K was signed by Defendants Ersek and Scheirman. The 2011 10-K also contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Ersek and Scheirman attesting

Class Action Complaint for Violation of the Federal Securities Laws

to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

17.     The 2011 10-K stated that Western Union "believe[s] our fraud prevention efforts are effective and comply with applicable law and best practices," stating in pertinent part:

> The remittance industry has come under increasing scrutiny from government regulators and others in connection with its ability to prevent its services from being abused by people seeking to defraud others. While **we believe our fraud prevention efforts are effective and comply with applicable law and best practices**, the ingenuity of criminal fraudsters, combined with the potential susceptibility to fraud by consumers during economically difficult times, make the prevention of consumer fraud a significant and challenging problem. Our failure to continue to help prevent such frauds or a change in laws or their interpretation could have an adverse effect on our business, financial condition and results of operations.

[Emphasis added].

18.     The 2011 10-K also touted Western Union's global compliance programs, including its anti-money laundering program, and touted Western Union's practice of continuing "to adapt our business practices and strategies to help us comply with current and evolving legal standards and industry practices," stating in pertinent part:

> **We have developed and continue to enhance our global compliance programs, including our anti-money laundering program, which comprises policies, procedures, systems and internal controls to monitor and to address various legal and regulatory requirements. In addition, we continue to adapt our business practices and strategies to help us comply with current and evolving legal standards and industry practices**. These programs include dedicated compliance personnel, training and monitoring programs, suspicious activity reporting, regulatory outreach and education, and support and guidance to our agent

- 5 -

network on regulatory compliance. Our money transfer network operates through third-party agents in most countries, and, therefore, there are limitations on our legal and practical ability to completely control those agents' compliance activities.

[Emphasis added].

19.     The 2011 10-K also stated that "Western Union is compliant with its regulatory responsibilities" in reference to its "regulatory goals—the prevention of money laundering, terrorist financing and identity theft and the protection of the individual's right to privacy," stating in pertinent part:

> **These regulatory goals—the prevention of money laundering, terrorist financing and identity theft and the protection of the individual's right to privacy**—may conflict, and the law in these areas is not consistent or settled. While **we believe that Western Union is compliant with its regulatory responsibilities**, the legal, political and business environments in these areas are rapidly changing, and subsequent legislation, regulation, litigation, court rulings or other events could expose Western Union to increased program costs, liability and reputational damage.

[Emphasis added].

20.     On February 22, 2013, the Company filed a Form 10-K for the fiscal year ended December 31, 2012 (the "2012 10-K") with the SEC, which provided the Company's year-end financial results and position and stated that the Company's internal control over financial reporting and disclosure controls and procedures were effective as of December 31, 2012. The 2012 10-K was signed by Defendants Ersek and Scheirman. The 2012 10-K also contained signed SOX certifications by Defendants Ersek and Scheirman attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

Class Action Complaint for Violation of the Federal Securities Laws

21.   The 2012 10-K stated that Western Union "believe[s] our fraud prevention efforts are effective and comply with applicable law," stating in pertinent part:

> The remittance industry, including Western Union, has come under increasing scrutiny from government regulators and others in connection with its ability to prevent its services from being abused by people seeking to defraud others. While **we believe our fraud prevention efforts are effective and comply with applicable law**, the ingenuity of criminal fraudsters, combined with the potential susceptibility to fraud by consumers during economically difficult times, make the prevention of consumer fraud a significant and challenging problem. Our failure to continue to help prevent such frauds and increased costs related to the implementation of enhanced anti-fraud measures, or a change in fraud prevention laws or their interpretation or the manner in which they are enforced could have an adverse effect on our business, financial condition and results of operations.

[Emphasis added].

22.   The 2012 10-K also touted Western Union's global compliance programs, including its anti-money laundering program, and touted Western Union's practice of continuing "to adapt our business practices and strategies to help us comply with current and evolving legal standards and industry practices," stating in pertinent part:

> **We have developed and continue to enhance our global compliance programs, including our anti-money laundering program comprised of policies, procedures, systems and internal controls to monitor and to address various legal and regulatory requirements. In addition, we continue to adapt our business practices and strategies to help us comply with current and evolving legal standards and industry practices, including heightened regulatory focus on compliance with anti-money laundering or fraud prevention requirements**. These programs

- 7 -

Class Action Complaint for Violation of the Federal Securities Laws

include dedicated compliance personnel, training and monitoring programs, suspicious activity reporting, regulatory outreach and education, and support and guidance to our agent network on regulatory compliance.

[Emphasis added].

23.    The 2012 10-K also stated that "Western Union is compliant with its regulatory responsibilities" in reference to its "regulatory goals - the prevention of money laundering, terrorist financing and identity theft and the protection of the individual's right to privacy," stating in pertinent part:

**These regulatory goals - the prevention of money laundering, terrorist financing and identity theft and the protection of the individual's right to privacy** - may conflict, and the law in these areas is not consistent or settled. While **we believe that Western Union is compliant with its regulatory responsibilities**, the legal, political and business environments in these areas are rapidly changing, and subsequent legislation, regulation, litigation, court rulings or other events could expose Western Union to increased program costs, liability and reputational damage.

[Emphasis added].

24.    On February 24, 2014, the Company filed a Form 10-K for the fiscal year ended December 31, 2013 (the "2013 10-K") with the SEC, which provided the Company's year-end financial results and position and stated that the Company's internal control over financial reporting and disclosure controls and procedures were effective as of December 31, 2013. The 2013 10-K was signed by Defendants Ersek and Agrawal. The 2013 10-K also contained signed SOX certifications by Defendants Ersek and Agrawal attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

Class Action Complaint for Violation of the Federal Securities Laws

25.   The 2013 10-K stated that Western Union "believe[s] our fraud prevention efforts are effective and comply with applicable law," stating in pertinent part:

> The remittance industry, including Western Union, has come under increasing scrutiny from government regulators and others in connection with its ability to prevent its services from being abused by people seeking to defraud others. While **we believe our fraud prevention efforts are effective and comply with applicable law**, the ingenuity of criminal fraudsters, combined with the potential susceptibility to fraud by consumers, make the prevention of consumer fraud a significant and challenging problem. Our failure to continue to help prevent such frauds and increased costs related to the implementation of enhanced anti-fraud measures, or a change in fraud prevention laws or their interpretation or the manner in which they are enforced could have an adverse effect on our business, financial condition and results of operations.

[Emphasis added].

26.   The 2013 10-K also touted Western Union's global compliance programs, including its anti-money laundering program, and touted Western Union's practice of continuing "to adapt our business practices and strategies to help us comply with current and evolving legal standards and industry practices," stating in pertinent part:

> **We have developed and continue to enhance our global compliance programs, including our anti-money laundering program comprised of policies, procedures, systems and internal controls to monitor and to address various legal and regulatory requirements. In addition, we continue to adapt our business practices and strategies to help us comply with current and evolving legal standards and industry practices, including heightened regulatory focus on compliance with anti-money laundering or fraud prevention requirements.**

- 9 -

[Emphasis added].

27.    The 2013 10-K also stated that "Western Union is compliant with its regulatory responsibilities" in reference to its "regulatory goals - the prevention of money laundering, terrorist financing and identity theft and the protection of the individual's right to privacy," stating in pertinent part:

> **These regulatory goals - the prevention of money laundering, terrorist financing and identity theft and the protection of the individual's right to privacy** - may conflict, and the law in these areas is not consistent or settled. While **we believe that Western Union is compliant with its regulatory responsibilities**, the legal, political and business environments in these areas are rapidly changing, and subsequent legislation, regulation, litigation, court rulings or other events could expose Western Union to increased program costs, liability and reputational damage.

[Emphasis added].

28.    On February 20, 2015, the Company filed a Form 10-K for the fiscal year ended December 31, 2014 (the "2014 10-K") with the SEC, which provided the Company's year-end financial results and position and stated that the Company's internal control over financial reporting and disclosure controls and procedures were effective as of December 31, 2014. The 2014 10-K was signed by Defendants Ersek and Agrawal. The 2014 10-K also contained signed SOX certifications by Defendants Ersek and Agrawal attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

29.    The 2014 10-K stated that Western Union "believe[s] our fraud prevention efforts comply with applicable law," stating in pertinent part:

> The remittance industry, including Western Union, has come under increasing scrutiny from government regulators and others in connection with its ability to prevent its services from being abused

- 10 -

by people seeking to defraud others. While **we believe our fraud prevention efforts comply with applicable law**, the ingenuity of criminal fraudsters, combined with the potential susceptibility to fraud by consumers, make the prevention of consumer fraud a significant and challenging problem. Our failure to continue to help prevent such frauds and increased costs related to the implementation of enhanced anti-fraud measures, or a change in fraud prevention laws or their interpretation or the manner in which they are enforced could have an adverse effect on our business, financial condition and results of operations.

[Emphasis added].

30.    The 2014 10-K also touted Western Union's global compliance programs, including its anti-money laundering program, and touted Western Union's practice of continuing "to adapt our business practices and strategies to help us comply with current and evolving legal standards and industry practices," stating in pertinent part:

**We have developed and continue to enhance our global compliance programs, including our anti-money laundering program comprised of policies, procedures, systems and internal controls to monitor and to address various legal and regulatory requirements**. **In addition, we continue to adapt our business practices and strategies to help us comply with current and evolving legal standards and industry practices, including heightened regulatory focus on compliance with anti-money laundering or fraud prevention requirements**.

[Emphasis added].

31.    The 2014 10-K also stated that "Western Union is compliant with its regulatory responsibilities" in reference to its "regulatory goals - the prevention of money laundering, terrorist financing and identity theft and the protection of the individual's right to privacy," stating in pertinent part:

- 11 -

**These regulatory goals - the prevention of money laundering, terrorist financing and identity theft and the protection of the individual's right to privacy** - may conflict, and the law in these areas is not consistent or settled. While **we believe that Western Union is compliant with its regulatory responsibilities**, the legal, political and business environments in these areas are rapidly changing, and subsequent legislation, regulation, litigation, court rulings or other events could expose Western Union to increased program costs, liability and reputational damage.

[Emphasis added].

32.    On February 19, 2016, the Company filed a Form 10-K for the fiscal year ended December 31, 2015 (the "2015 10-K") with the SEC, which provided the Company's year-end financial results and position and stated that the Company's internal control over financial reporting and disclosure controls and procedures were effective as of December 31, 2015. The 2015 10-K was signed by Defendants Ersek and Agrawal. The 2015 10-K also contained signed SOX certifications by Defendants Ersek and Agrawal attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

33.    The 2015 10-K stated that Western Union "believe[s] our fraud prevention efforts comply with applicable law," stating in pertinent part:

The remittance industry, including Western Union, has come under increasing scrutiny from government regulators and others in connection with its ability to prevent its services from being abused by people seeking to defraud others. While **we believe our fraud prevention efforts comply with applicable law**, the ingenuity of criminal fraudsters, combined with the potential susceptibility to fraud by consumers, make the prevention of consumer fraud a significant and challenging problem. Our failure to continue to help prevent such frauds and increased costs related to the implementation of enhanced anti-fraud measures, or a change in fraud prevention laws or their interpretation or the manner in which they are enforced could have an

Class Action Complaint for Violation of the Federal Securities Laws

adverse effect on our business, financial condition, results of operations, and cash flows.

[Emphasis added].

34.   The 2015 10-K also touted Western Union's global compliance programs, including its anti-money laundering program, and touted Western Union's practice of continuing "to adapt our business practices and strategies to help us comply with current and evolving legal standards and industry practices," stating in pertinent part:

> **We have developed and continue to enhance our global compliance programs, including our anti-money laundering program comprised of policies, procedures, systems and internal controls to monitor and to address various legal and regulatory requirements. In addition, we continue to adapt our business practices and strategies to help us comply with current and evolving legal standards and industry practices, including heightened regulatory focus on compliance with anti-money laundering or fraud prevention requirements.**

[Emphasis added].

35.   The 2015 10-K also stated that "Western Union is compliant with its regulatory responsibilities in all material respects" in reference to its "regulatory goals - the prevention of money laundering, terrorist financing and identity theft and the protection of the individual's right to privacy," stating in pertinent part:

> **These regulatory goals - the prevention of money laundering, terrorist financing and identity theft and the protection of the individual's right to privacy** - may conflict, and the law in these areas is not consistent or settled. While **we believe that Western Union is compliant with its regulatory responsibilities in all material respects**, the legal, political and business environments in these areas are rapidly changing, and subsequent legislation, regulation, litigation, court rulings or other events could expose

Class Action Complaint for Violation of the Federal Securities Laws

Western Union to increased program costs, liability and reputational damage.

[Emphasis added].

36.     The statements referenced in ¶¶ 16 - 35 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Western Union's fraud prevention efforts did not comply with applicable laws; (2) Western Union willfully failed to maintain an effective anti-money laundering program; (3) Western Union aided and abetted wire fraud; (4) for at least five years, Western Union knew of agents structuring transactions designed to avoid the reporting requirements of the Bank Secrecy Act; (5) Western Union was not compliant with its regulatory responsibilities; (6) between 2004 and 2012, Western Union violated U.S. laws—the Bank Secrecy Act and anti-fraud statutes—by processing hundreds of thousands of transactions for Western Union agents and others involved in an international consumer fraud scheme; (7) Western Union knew of but failed to take corrective action against Western Union agents involved in or facilitating fraud-related transactions; (8) between January 1, 2004 and August 29, 2015, Western Union received at least 550,928 complaints about fraud-induced money transfers, totaling at least $632,721,044; and (9) as a result, Defendants' public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

37.     On January 19, 2017, *The Wall Street Journal* published an article entitled "Western Union to Pay $586 Million to Resolve Criminal, Civil Charges," stating that Western Union "has agreed to pay $586 million to resolve U.S. criminal and civil charges that it failed to effectively police customers who were potentially using its services to engage in fraud," stating in pertinent part:

- 14 -

Class Action Complaint for Violation of the Federal Securities Laws

## Western Union to Pay $586 Million to Resolve Criminal, Civil Charges

Prosecutors agree to drop criminal charges if the money-transfer company improves its compliance program

By **ARUNA VISWANATHA**

Updated Jan. 19, 2017 1:15 p.m. ET

Money-transfer company **Western Union Co. has agreed to pay $586 million to resolve U.S. criminal and civil charges that it failed to effectively police customers who were potentially using its services to engage in fraud**, authorities said Thursday.

The company entered into a "deferred prosecution" agreement with the Justice Department and settled related civil claims from the Federal Trade Commission.

Under the deal, prosecutors agreed to defer and drop criminal charges against the company if it improves its compliance program. They could pursue a prosecution should the company fail to live up to its end of the bargain, but that rarely occurs.

In the agreement, **Western Union admitted it failed to maintain an effective anti-money-laundering program and it aided and abetted wire fraud**.

The agreement follows a series of prosecutions since 2001 of Western Union agents who were convicted of working with criminals to defraud people through mass-marketing schemes.

It also follows a $94 million settlement in 2010 between Western Union and Arizona, along with three other states, over money-laundering lapses, under which it agreed to improve its monitoring systems.

[Emphasis added].

- 15 -

Class Action Complaint for Violation of the Federal Securities Laws

38.     On January 19, 2017, the U.S. Department of Justice issued a release entitled "Western Union Admits Anti-Money Laundering and Consumer Fraud Violations, Forfeits $586 Million in Settlement with Justice Department and Federal Trade Commission," stating in pertinent part:

FOR IMMEDIATE RELEASE              Thursday, January 19, 2017

**Western Union Admits Anti-Money Laundering and Consumer Fraud Violations, Forfeits $586 Million in Settlement with Justice Department and Federal Trade Commission**

Company also Agrees to Implement Anti-Fraud Program and Enhanced Compliance Obligations in Agreements with Federal Authorities

**The Western Union Company (Western Union), a global money services business headquartered in Englewood, Colorado, has agreed to forfeit $586 million and enter into agreements with the Justice Department, the Federal Trade Commission (FTC), and the U.S. Attorney's Offices** for the Middle District of Pennsylvania, the Central District of California, the Eastern District of Pennsylvania and the Southern District of Florida. **In its agreement with the Justice Department, Western Union admits to criminal violations including willfully failing to maintain an effective anti-money laundering (AML) program and aiding and abetting wire fraud**.

Acting Assistant Attorney General David Bitkower of the Justice Department's Criminal Division; FTC Chairwoman Edith Ramirez; U.S. Attorney Bruce D. Brandler of the Middle District of Pennsylvania; U.S. Attorney Eileen M. Decker of the Central District of California; Acting U.S. Attorney Louis D. Lappen of the Eastern District of Pennsylvania; U.S. Attorney Wifredo A. Ferrer of the Southern District of Florida; Inspector in Charge David W. Bosch of the U.S. Postal Inspection Service (USPIS) Philadelphia Division; Assistant Director in Charge Deirdre Fike of the FBI's Los Angeles Field Office; Chief Richard Weber of Internal Revenue Service-Criminal Investigation (IRS-CI); Special Agent in Charge Marlon V.

Class Action Complaint for Violation of the Federal Securities Laws

Miller of U.S. Immigration and Customs Enforcement's Homeland Security Investigations (HSI) Philadelphia; and Special Agent in Charge Stephen Carroll of the Office of Inspector General for the Board of Governors of the Federal Reserve System and the Consumer Financial Protection Bureau (FRB-CFPB OIG) Eastern Region made the announcement.

"As this case shows, wiring money can be the fastest way to send it – directly into the pockets of criminals and scam artists," said Acting Assistant Attorney General Bitkower. "Western Union is now paying the price for placing profits ahead of its own customers. Together with our colleagues, the Criminal Division will both hold to account those who facilitate fraud and abuse of vulnerable populations, and also work to recoup losses and compensate victims."

"Western Union owes a responsibility to American consumers to guard against fraud, but **instead the company looked the other way, and its system facilitated scammers and rip-offs**," said Chairwoman Ramirez. "The agreements we are announcing today will ensure Western Union changes the way it conducts its business and provides more than a half billion dollars for refunds to consumers who were harmed by the company's unlawful behavior."

"The U.S. Attorney's Office for the Middle District of Pennsylvania has a long history of prosecuting corrupt Western Union Agents," said U.S. Attorney Brandler. "Since 2001, our office, in conjunction with the U.S. Postal Inspection Service, **has charged and convicted 26 Western Union Agents in the United States and Canada who conspired with international fraudsters to defraud tens of thousands of U.S. residents via various forms of mass marketing schemes**. I am gratified that the deferred prosecution agreement reached today with Western Union ensures that $586 million will be available to compensate the many victims of these frauds."

"**Our investigation uncovered hundreds of millions of dollars being sent to China in structured transactions designed to avoid the reporting requirements of the Bank Secrecy Act, and much of the money was sent to China by illegal immigrants to pay their human smugglers**," said U.S. Attorney Decker. "In a case being

Class Action Complaint for Violation of the Federal Securities Laws

prosecuted by my office, a Western Union agent has pleaded guilty to federal charges of structuring transactions – **illegal conduct the company knew about for at least five years**. Western Union documents indicate that its employees fought to keep this agent – as well as several other high-volume independent agents in New York City – working for Western Union because of the high volume of their activity. This action today will ensure that Western Union effectively controls its agents and prevents the use of its money transfer system for illegal purposes."

"Western Union's failure to comply with anti-money laundering laws provided fraudsters and other criminals with a means to transfer criminal proceeds and victimize innocent people," said Acting U.S. Attorney Lappen. "**Western Union has agreed to forfeit $586 million, the largest forfeiture ever imposed on a money services business, and has agreed to take specific steps to ensure that it complies with the law in the future**. This office will continue to vigorously enforce the anti-money laundering laws and regulations, which are necessary to prevent those engaged in fraud, terrorism, human trafficking, drug dealing and other crimes from using companies like Western Union to further their illegal activity."

"**Western Union**, the largest money service business in the world**, has admitted to a flawed corporate culture that failed to provide a checks and balances approach to combat criminal practices**," said U.S. Attorney Ferrer. "**Western Union's failure to implement proper controls and discipline agents that violated compliances policies enabled the proliferation of illegal gambling, money laundering and fraud-related schemes. Western Union's conduct resulted in the processing of hundreds of millions of dollars in prohibited transactions**. Today's historic agreement, involving the largest financial forfeiture by a money service business, makes it clear that all corporations and their agents will be held accountable for conduct that circumvents compliance programs designed to prevent criminal conduct."

"The U.S. Postal Inspection Service has been at the forefront of protecting consumers from fraud schemes for many years," said Inspector in Charge Bosch. "When private businesses participate in

- 18 -

Class Action Complaint for Violation of the Federal Securities Laws

the actions that Western Union was involved in, it makes it easier for criminals to victimize innocent citizens. Our commitment to bringing these criminals to justice will not waiver, and we look forward to facilitating compensation to victims."

"Los Angeles-defendant Wang's company was considered to be among the largest Western Union agents in the United States as over $310 million was sent to China in a span of five years, half of which was illegally structured and transmitted using false identification," said Assistant Director in Charge Fike. "**Rather than ensuring their high volume agents were operating above-board, Western Union rewarded them without regard to the blatant lack of compliance and illegal practices taking place**. This settlement should go a long way in thwarting the proceeds of illicit transactions being sent to China to fund human smuggling or drug trafficking, as well as to interrupt the ease with which scam artists flout U.S. banking regulations in schemes devised to defraud vulnerable Americans."

"As a major player in the money transmittal business, Western Union had an obligation to its customers to ensure they offered honest services, which include upholding the Bank Secrecy Act, as well as other U.S. laws," said Chief Weber. "**Western Union's blatant disregard of their anti-money laundering compliance responsibilities was criminal and significant**. IRS-CI special agents – working with their investigative agency partners – uncovered the massive AML compliance failures and is proud to be part of this historic criminal resolution."

"Today's announcement of this significant settlement highlights the positive result of HSI's collaboration with our partner agencies to hold **Western Union accountable for their failure to comply with bank secrecy laws that preserve the integrity of the financial system of the United States**," said Special Agent in Charge Miller. "As a result of this settlement, Western Union now answers for these violations. I thank the Office of Inspector General for the Board of Governors of the Federal Reserve System and the Consumer Financial Protection Bureau for their partnership in this investigation."

Class Action Complaint for Violation of the Federal Securities Laws

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**According to admissions contained in the deferred prosecution agreement (DPA) and the accompanying statement of facts, between 2004 and 2012, Western Union violated U.S. laws—the Bank Secrecy Act (BSA) and anti-fraud statutes—by processing hundreds of thousands of transactions for Western Union agents and others involved in an international consumer fraud scheme**.

As part of the scheme, fraudsters contacted victims in the U.S. and falsely posed as family members in need or promised prizes or job opportunities. The fraudsters directed the victims to send money through Western Union to help their relative or claim their prize. **Various Western Union agents were complicit in these fraud schemes, often processing the fraud payments for the fraudsters in return for a cut of the fraud proceeds**.

**Western Union knew of but failed to take corrective action against Western Union agents involved in or facilitating fraud-related transactions**. Beginning in at least 2004, Western Union recorded customer complaints about fraudulently induced payments in what are known as consumer fraud reports (CFRs). In 2004, Western Union's Corporate Security Department proposed global guidelines for discipline and suspension of Western Union agents that processed a materially elevated number of fraud transactions. In these guidelines, the Corporate Security Department effectively recommended automatically suspending any agent that paid 15 CFRs within 120 days. Had Western Union implemented these proposed guidelines, it could have prevented significant fraud losses to victims and would have resulted in corrective action against more than 2,000 agents worldwide between 2004 and 2012.

Court documents also show Western Union's BSA failures spanned eight years and involved, among other things, **the acquisition of a significant agent that Western Union knew prior to the acquisition had an ineffective AML program and had contracted with other agents that were facilitating significant levels of consumer fraud**. Despite this knowledge, Western Union moved forward with the acquisition and did not remedy the AML failures or terminate the high-fraud agents.

Class Action Complaint for Violation of the Federal Securities Laws

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Similarly, Western Union failed to terminate or discipline agents who repeatedly violated the BSA and Western Union policy through their structuring activity in the Central District of California and the Eastern District of Pennsylvania. The BSA requires financial institutions, including money services businesses such as Western Union, to file currency transaction reports (CTRs) for transactions in currency greater than $10,000 in a single day. To evade the filing of a CTR and identification requirements, criminals will often structure their currency transactions so that no single transaction exceeds the $10,000 threshold. Financial institutions are required to report suspected structuring where the aggregate number of transactions by or on behalf of any person exceeds more than $10,000 during one business day. **Western Union knew that certain of its U.S. Agents were allowing or aiding and abetting structuring by their customers. Rather than taking corrective action to eliminate structuring at and by its agents, Western Union, among other things, allowed agents to continue sending transactions through Western Union's system and paid agents bonuses. Despite repeated compliance review identifying suspicious or illegal behavior by its agents, Western Union almost never identified the suspicious activity those agents engaged in in its required reports to law enforcement**

Finally, Western Union has been on notice since at least December 1997, that individuals use its money transfer system to send illegal gambling transactions from Florida to offshore sportsbooks. Western Union knew that gambling transactions presented a heightened risk of money laundering and that **through at least 2012, certain procedures it implemented were not effective at limiting transactions with characteristics indicative of illegal gaming from the United States to other countries**.

Western Union entered into a DPA in connection with a two-count felony criminal information filed today in the Middle District of Pennsylvania charging Western Union with willfully failing to maintain an effective AML program and aiding and abetting wire fraud. Pursuant to the DPA, Western Union has agreed to forfeit $586 million and also agreed to enhanced compliance obligations to prevent

Class Action Complaint for Violation of the Federal Securities Laws

a repeat of the charged conduct, including creating policies and procedures:

- for corrective action against agents that pose an unacceptable risk of money laundering or have demonstrated systemic, willful or repeated lapses in compliance;

- that ensure that its agents around the world will adhere to U.S. regulatory and AML standards; and

- that ensure that the company will report suspicious or illegal activity by its agents or related to consumer fraud reports.

In a related case, Western Union agreed to settle charges by the FTC in a complaint filed today in the U.S. District Court for the Middle District of Pennsylvania, alleging that the company's conduct violated the FTC Act. **The complaint charges that for many years, fraudsters around the world have used Western Union's money transfer system even though the company has long been aware of the problem, and that some Western Union agents have been complicit in fraud**. **The FTC's complaint alleges that Western Union declined to put in place effective anti-fraud policies and procedures and has failed to act promptly against problem agents**. **Western Union has identified many of the problem agents but has profited from their actions by not promptly suspending and terminating them.**

In resolving the FTC charges, Western Union agreed to a monetary judgment of $586 million and to implement and maintain a comprehensive anti-fraud program with training for its agents and their front line associates, monitoring to detect and prevent fraud-induced money transfers, due diligence on all new and renewing company agents, and suspension or termination of noncompliant agents.

The FTC order prohibits Western Union from transmitting a money transfer that it knows or reasonably should know is fraud-induced, and requires it to:

- 22 -

- block money transfers sent to any person who is the subject of a fraud report;

- provide clear and conspicuous consumer fraud warnings on its paper and electronic money transfer forms;

- increase the availability of websites and telephone numbers that enable consumers to file fraud complaints; and

- refund a fraudulently induced money transfer if the company failed to comply with its anti-fraud procedures in connection with that transaction.

In addition, consistent with the telemarketing sales rule, Western Union must not process a money transfer that it knows or should know is payment for a telemarketing transaction. The company's compliance with the order will be monitored for three years by an independent compliance auditor.

Since 2001, the department has charged and convicted 29 owners or employees of Western Union agents for their roles in fraudulent and structured transactions. The U.S. Attorney's Office of the Middle District of Pennsylvania has charged and convicted 26 Western Union agent owners and employees for fraud-related violations; the U.S. Attorney's Office of the Central District of California has secured a guilty plea from one Western Union agent for BSA violations, and the U.S. Attorney's Office for the Eastern District of Pennsylvania has secured guilty pleas for BSA violations of two other individuals associated with Western Union agents for BSA violations.

[Emphasis added].

39.    On January 19, 2017, the Federal Trade Commission ("FTC") published a release entitled "$586 million Western Union settlement: Be careful about the company your company keeps," stating that Western Union's in house data documented the numerous fraudulent complaints the Company received between 2004 and 2015, stating in pertinent part:

Class Action Complaint for Violation of the Federal Securities Laws

**$586 million Western Union settlement: Be careful about the company your company keeps**

By: Lesley Fair | Jan 19, 2017 12:11AM

\*      \*      \*

**For example, between 2004 and 2015**, Western Union received 146,909 complaints about bogus online purchases, totaling at least $187 million in losses. Fraudulent lotteries accounted for another 75,543 complaints, totaling $86 million in losses. And those "Wire money to get me out of jail!" scams that target unsuspecting family members generated 41,897 complaints and at least $73 million in losses.

Of Western Union's total network of 515,000 agents, the FTC says a small number account for the vast majority of consumer complaints. You'll want to read the complaint for details, but here's just one example. In 2012, Mexico had 17,710 Western Union agent locations, but 137 – less than 1% of them – accounted for more than 80% of the reported fraud. And those are stats based on Western Union's own documents.

Sky-high consumer complaint rates were just the start. Thirty-nine Western Union agents have been charged in the U.S. and Canada for crimes like mail fraud, wire fraud, or money laundering, with more than 100 arrested by law enforcement agencies in other countries. Some were prosecuted for being in cahoots with con artists. Others were charged with setting up their own scams.

But even in the face of consumer complaints, criminal prosecutions, a 2005 settlement with AGs from 47 states and the District of Columbia, a 2009 FTC action against competitor MoneyGram, and warnings from the U.S. Secret Service and authorities in Canada, Japan, the U.K., Spain, and elsewhere, the FTC says it was business as usual for Western Union. In certain countries where Western Union was at a particularly high risk for use by criminals – Nigeria, for example – **Western Union had rarely, if ever, terminated an agent for fraud as of October 2015.**

- 24 -

[Emphasis added].

40.     According to the FTC's complaint against Western Union, dated January 19, 2017, and published on the FTC's website[1], "between January 1, 2004 and August 29, 2015, Western Union received at least 550,928 complaints about fraud-induced money transfers, totaling at least $632,721,044," stating in pertinent part:

> 18. **Western Union maintains a database of complaints it receives about fraud-induced money transfers. Based on information in that database, between January 1, 2004 and August 29, 2015, Western Union received at least 550,928 complaints about fraud-induced money transfers, totaling at least $632,721,044.** Over 80% of the complaints in the database were from U.S. consumers. The average individual consumer fraud loss reflected in that database was approximately $1,148. That is more than three times the amount of Western Union's average money transfer for the years 2010 through 2014—approximately $346—and more than seven times the amount of Western Union's median money transfer for the same period—approximately $162.

[Emphasis added].

41.     On this news, shares of Western Union fell $0.87 per share, or over 3.9%, over two trading days to close at $20.98 per share on January 20, 2017, damaging investors.

42.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

---

[1] This complaint was accessible via a link within the FTC release, dated January 19, 2017, entitled "$586 million Western Union settlement: Be careful about the company your company keeps."

Class Action Complaint for Violation of the Federal Securities Laws

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

43.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Western Union securities publicly traded on the NYSE during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

44.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Western Union securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

45.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

46.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

47.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

Class Action Complaint for Violation of the Federal Securities Laws

- • whether the federal securities laws were violated by Defendants' acts as alleged herein;

- • whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

- • whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- • whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

- • whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

- • whether the prices of Western Union securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- • whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

48.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

49.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

Class Action Complaint for Violation of the Federal Securities Laws

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- Western Union securities are traded in efficient markets;
- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NYSE, and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiff and members of the Class purchased and/or sold Western Union securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

50. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

51. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

52. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

Class Action Complaint for Violation of the Federal Securities Laws

53.    This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

54.    During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

55.    The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Western Union securities during the Class Period.

56.    The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with

Class Action Complaint for Violation of the Federal Securities Laws

1  the Company which made them privy to confidential proprietary information
2  concerning the Company, participated in the fraudulent scheme alleged herein.

3      57.    Individual Defendants, who are the senior officers and/or directors of
4  the Company, had actual knowledge of the material omissions and/or the falsity of
5  the material statements set forth above, and intended to deceive Plaintiff and the other
6  members of the Class, or, in the alternative, acted with reckless disregard for the truth
7  when they failed to ascertain and disclose the true facts in the statements made by
8  them or other personnel of the Company to members of the investing public,
9  including Plaintiff and the Class.

10     58.    As a result of the foregoing, the market price of Western Union
11 securities was artificially inflated during the Class Period. In ignorance of the falsity
12 of the Company's and the Individual Defendants' statements, Plaintiff and the other
13 members of the Class relied on the statements described above and/or the integrity of
14 the market price of Western Union securities during the Class Period in purchasing
15 Western Union securities at prices that were artificially inflated as a result of the
16 Company's and the Individual Defendants' false and misleading statements.

17     59.    Had Plaintiff and the other members of the Class been aware that the
18 market price of Western Union securities had been artificially and falsely inflated by
19 the Company's and the Individual Defendants' misleading statements and by the
20 material adverse information which the Company's and the Individual Defendants did
21 not disclose, they would not have purchased Western Union securities at the
22 artificially inflated prices that they did, or at all.

23     60.    As a result of the wrongful conduct alleged herein, Plaintiff and other
24 members of the Class have suffered damages in an amount to be established at trial.

25     61.    By reason of the foregoing, the Company and the Individual Defendants
26 have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder
27 and are liable to the Plaintiff and the other members of the Class for substantial
28

Class Action Complaint for Violation of the Federal Securities Laws

damages which they suffered in connection with their purchases of Western Union securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of The Exchange Act
### Against The Individual Defendants

62.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

63.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

64.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

65.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Western Union securities.

66.     Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being

directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

67.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: January 26, 2017                Respectfully submitted,

                                       **THE ROSEN LAW FIRM, P.A.**

                                       By: /s/ Laurence M. Rosen
                                       Laurence M. Rosen, Esq. (SBN 219683)

Class Action Complaint for Violation of the Federal Securities Laws

355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Counsel for Plaintiff

Class Action Complaint for Violation of the Federal Securities Laws